# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Elaine E. Bucklo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 7683 | **DATE** | 9/25/2003 |
| **CASE TITLE** | Continental Casualty Co., et al. vs. The Southern Co., et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due _____. Reply to answer brief due _____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order granting the Southern Company's motion to dismiss (6-1) the cross-claims for lack of personal jurisdiction. The docket clerk is directed to terminate document number 4-1 as moot. Any pending motion in this case is terminated as moot.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 7 | Document Number |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | SEP 2 6 2003 | |
| | Notified counsel by telephone. | | date docketed | 42 |
| | Docketing to mail notices. | | | |
| ✓ | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 9/25/2003 | |
| MPJ | courtroom deputy's initials | 03 SEP 25 PM 4:51 Date/time received in central Clerk's Office | date mailed notice MPJ mailing deputy initials | |

CONTINENTAL CASUALTY COMPANY, and )
COLUMBIA CASUALTY COMPANY, )
)
Plaintiffs, )
)
v. )
) No. 02 C 7683
THE SOUTHERN COMPANY; AMERICAN HOME )
ASSURANCE COMPANY; BELLEFONTE )
INSURANCE COMPANY, n/k/a )
NORTHWESTERN NATIONAL INSURANCE )
COMPANY; FEDERAL INSURANCE COMPANY; )
GRANITE STATE INSURANCE COMPANY; )
HIGHLANDS INSURANCE COMPANY; and )
NATIONAL UNION FIRE INSURANCE )
COMPANY OF PITTSBURGH, PA, )
)
Defendants. )

## MEMORANDUM OPINION AND ORDER

Plaintiffs Continental Casualty Company and Columbia Casualty Company (collectively "CNA") filed a declaratory judgment action in Illinois state court against, among others, defendants The Southern Company ("Southern"), American Home Assurance Company ("American Home"), Bellefonte Insurance Company n/k/a Northwestern National Insurance Company ("Northwestern"), Federal Insurance Company ("Federal"), Granite State Insurance Company ("Granite State"), Highlands Insurance Company ("Highlands"), and National Union Fire Insurance Company of Pittsburgh ("National Union"). Southern is a large utility company, insured by the other defendants. CNA is also an insurer of Southern. CNA's action sought a declaration of the coverage obligations of itself and the other insurers with

respect to various environmental contamination and asbestos exposure allegations that had been leveled against Southern. American Home, Federal, Granite State, Highlands, and National Union (collectively "Insurers") all filed crossclaims against Southern, and all Insurers but Federal filed counterclaims against CNA. Northwestern also filed a crossclaim against Southern and a counterclaim against CNA. CNA and Southern subsequently entered into a settlement agreement that resulted in dismissal of CNA's claims against all defendants, leaving only the counterclaims and crossclaims. Southern removed the case to federal court. Following removal, Northwestern voluntarily dismissed its counterclaim and crossclaim, and Insurers voluntarily dismissed their counterclaims, leaving only Insurers' crossclaims against Southern to be decided. Southern now moves to dismiss the crossclaims for lack of subject matter jurisdiction, lack of personal jurisdiction, and improper venue. I grant the motion to dismiss because I lack personal jurisdiction over Southern.

I. Subject Matter Jurisdiction

Southern's argument that this case should be dismissed for lack of subject matter jurisdiction is somewhat confused. It was Southern who initially invoked the subject matter jurisdiction of this court when it filed a notice of removal. In the notice of removal, Southern asserted that I could properly exercise diversity jurisdiction over this case. (Notice of Removal ¶¶ 10-13.)

Southern now argues that this case is not ripe, which is an issue of subject matter jurisdiction. *Smith v. Wisconsin Dep't of Agric., Trade & Consumer Prot.*, 23 F.3d 1134, 1142 (7th Cir. 1994). The proper remedy for lack of subject matter jurisdiction in a case removed from state court is not dismissal, however; it is remand. 28 U.S.C. § 1447(c) ("If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded."); *Smith,* 23 F.3d at 1142 (vacating district court's dismissal of removed case for lack of subject matter jurisdiction, instructing district court to remand instead). Southern cannot have it both ways. Either I have subject matter jurisdiction and the case was properly removed, or I do not have subject matter jurisdiction and the case must be remanded to state court. I may not dismiss this case for lack of subject matter jurisdiction.

As both sides admit that there is complete diversity here and the jurisdictional amount is met (and I have no reason to doubt either assertion), the only issue relating to subject matter jurisdiction is ripeness. Insurers' crossclaims seek a declaration that they have no obligation to provide coverage for Southern's environmental contamination and asbestos exposure claims. The Declaratory Judgment Act, 28 U.S.C. § 2201, permits me to "declare the rights and other legal relations of any interested party seeking such declaration." This statute, however, does not--

indeed, could not--dispense with the Article III case or controversy requirement. *Nationwide Ins. v. Zavalis*, 52 F.3d 689, 691-92 (7th Cir. 1995). The case or controversy requirement "keeps federal courts in the business of resolving existing legal disputes and out of the business of offering advice on the legality of a proposed course of action." *Deveraux v. City of Chicago*, 14 F.3d 328, 330 (7th Cir. 1994). While the distinction between an Article III controversy and an abstract question of law is necessarily one of degree, and the Seventh Circuit has acknowledged the difficulty, if not impossibility, of drawing a bright line, *id.*, the Supreme Court has outlined the broad parameters of a justiciable controversy:

> The controversy must be definite and concrete, touching the legal relations of parties having adverse interests. It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical set of facts.

*Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-41 (1937) *cited in Deveraux*, 14 F.3d at 330-31.

The dispute here is an Article III controversy. While Southern asserts that there is no current controversy between the parties because it is not making a demand under the Insurers' policies at this time, the Insurers have submitted evidence indicating that Southern has made various demands under the

4

policies.[1]  A November 18, 1999 letter from Southern's counsel to American Home describes a belief by the Georgia Department of Natural Resources Environmental Protection that a Southern subsidiary may be responsible for environmental contamination.  The letter requests that American Home "accept this letter as Southern's formal notice of a claim" and that American Home "acknowledge coverage of this claim, investigate the claims, indemnify and, if provided under your policy(s), defend your insured and pay your insured's costs connected with this claim."  (Mem. Opp'n Mot. Dismiss Cross-cl. Ex.  D.)  A November 23, 1999 letter from Southern to American Home describes a lawsuit filed by the United States against Southern for violations of the Clean Air Act, as well as a "Notice of Violations" issued to Southern by the EPA.  Again, the letter asks American Home to "accept this letter as Southern's formal notice of a claim" and to "acknowledge coverage of this claim, investigate the claims, indemnify and, if provided under your policy(s), pay your insureds' defense costs connected with this claim."  (Id. Ex. E.)  A November 7, 2001 letter was also sent from Southern to American Home describing a lawsuit filed against Southern by parties alleging exposure to asbestos at two of Southern's power plants.  This letter also asks that American Home "accept this letter as notice of an occurrence

---

[1] In determining whether I have subject matter jurisdiction, I may consider pertinent evidence submitted by the parties. *Sapperstein v. Hager*, 188 F.3d 852, 855 (7th Cir. 1999).

and claim" and that it "acknowledge coverage of this claim, investigate this claim, indemnify and, if provided under the policy or policies issued by American Home Assurance Company, defend your insured and pay your insured's costs connected with this claim." (*Id.* Ex. F.)

Similar or identical letters were sent to other of the Insurers as well. The November 23, 1999 letter describing the lawsuit filed by the United States was sent to National Union and Granite State. (*Id.* Ex. E.) The November 18, 1999 letter describing Georgia's belief that a Southern subsidiary was responsible for environmental contamination was sent to Highlands. (Joinder Mem. Opp'n Mot. Dismiss Cross-cl. Ex. A.) A November 7, 2001 letter was also sent to Highlands describing an asbestos exposure lawsuit, requesting that Highlands "accept this letter as notice of an occurrence and claim" and "acknowledge coverage of this claim, investigate this claim, indemnify and, if provided for under the policy or policies issued by Highlands Insurance Company, defend your insured and pay your insured's costs connected with this claim." (*Id.*)[2]

---

[2] No evidence was submitted establishing a controversy between Southern and Federal. Absent an Article III controversy between Southern and Federal, I have no subject matter jurisdiction over Federal's crossclaim and should remand to the state court. However, because (as discussed below) I find that there is no personal jurisdiction over Southern in Illinois based on federal constitutional principles, and because Southern's removal was nonfrivolous, I may dismiss Federal's crossclaim for lack of personal jurisdiction despite the fact that technically remand is

These letters establish that a definite and concrete dispute "touching the legal relations of parties having adverse interests" exists such that the Article III case or controversy requirement is satisfied. *See Am. Home Ins. Co. v. Martin*, No. 92 C 1377, 1992 WL 123132, at *3 (N.D. Ill. May 28, 1992) (Nordberg, J.) ("Several cases in this district have addressed, in declaratory judgment actions [between insurers and insureds], issues of liability coverage or limits of liability even though the underlying adversary proceedings had not been resolved."). The most analogous case cited by Southern in support of its position that there is not presently a case or controversy before me is *Atlanta International Insurance Co. v. Atchison, Topeka & Santa Fe Railway Co.*, 938 F.2d 81 (7th Cir. 1991). In that case, an insured had sent a letter to nearly 170 of its insurers notifying them that a $750 million verdict had just been awarded against it. The letter noted a prospect for settlement discussions, soliciting the insurers' views and inviting their participation. An informational meeting sponsored by the insured made clear that no decision had been reached on which policy years were implicated by the verdict, which had been made in a Sherman Act case alleging a conspiracy spanning

---

called for. *See Asociacion Nacional de Pescadores v. Dow Quimica*, 988 F.2d 559, 566-67 (5th Cir. 1993) (affirming dismissal for lack of personal jurisdiction despite concluding that district court should have remanded for lack of subject matter jurisdiction instead), *cited with approval in Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 586-87 (1999).

7

a number of years. In a declaratory judgment action brought by one of the insurers ("Atlanta"), the district court dismissed for lack of subject matter jurisdiction, finding no actual controversy between the parties. The Seventh Circuit affirmed. Atlanta had provided only a single year of coverage to the insured, and based on a statute of limitations ruling in the Sherman Act case, the verdict was premised on conduct occurring after that year. There was thus substantial uncertainty as to whether insured's liability would be based on occurrences during Atlanta's policy year. Consequently, the Seventh Circuit noted that "[t]here is no definite indication that Atlanta was actually expected to pay anything as a result of the letter. Atlanta knew there had been no determination as to what policy years were affected. This notification from [insured] is a far cry from a demand for payment, or even a threat to make a demand for payment." *Id.* at 84.

Here, in contrast, there was a definite indication that the Insurers were actually expected to pay something. All the letters discussed above expressly requested indemnification from the Insurers, and if applicable, payment of Southern's defense costs. *Atlanta International* is thus not applicable. Because there exists an Article III controversy and the statutory requirements for the exercise of diversity jurisdiction have been met, I have subject matter jurisdiction over this case and it was properly removed.

## II. Personal Jurisdiction

For a federal court sitting in Illinois exercising diversity jurisdiction, the personal jurisdiction issue essentially boils down to an inquiry into whether a defendant has certain minimum contacts with Illinois such that maintenance of the suit does not offend traditional notions of fair play and substantial justice. *See MAC Funding Corp. v. Northeast Impressions, Inc.*, 215 F. Supp. 2d 978, 979-80 (N.D. Ill. 2002) (Bucklo, J.) (describing how the traditional three-part inquiry into state long-arm statute, state constitutional law, and federal constitutional law collapses in Illinois into a single federal constitutional inquiry into minimum contacts). Insurers have the burden of demonstrating the existence of personal jurisdiction over Southern. *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1276 (7th Cir. 1997). Thus, Insurers must establish that Southern has sufficient minimum contacts with Illinois. In their original brief opposing Southern's motion to dismiss, Insurers pointed to *Alderson v. Southern Co.*, 747 N.E.2d 926 (Ill. App. Ct. 2001), an Illinois case in which the court found Southern subject to general personal jurisdiction in Illinois.

In *Alderson*, the court found that Southern maintained continuous and systematic business contacts with Illinois sufficient to permit the exercise of general personal jurisdiction

over it.[3] The evidence in *Alderson* established that Southern is a holding company doing business through subsidiaries. Several of those subsidiaries (collectively "State Line") owned and operated a power plant in Hammond, Indiana on the Indiana/Illinois border. In a personal injury case involving an explosion at the State Line plant, the *Alderson* court found Southern subject to general personal jurisdiction in Illinois. This finding was based on the fact that State Line had committed to sell the plant's electrical output to an Illinois utility company exclusively for fifteen years. *Alderson*, 747 N.E.2d at 947. As Southern pointed out in its original reply brief, however, Southern Energy, Inc. n/k/a Mirant Corporation ("Mirant"), a subsidiary that owned the State Line subsidiaries, was spun off from Southern in April 2001, more than ten months prior to the original filing of this suit in February 2002. (Reply Supp. Mot. Dismiss Cross-cl. at 9.) Insurers' reliance on the *Alderson* decision is therefore misplaced. *Cf. Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44, 52 (2d Cir. 1991) ("[General] personal jurisdiction depends on the defendant's contacts with the forum state at the time the lawsuit was filed.").

Following jurisdictional discovery, Insurers filed a

---

[3] "Continuous and systematic" is the test for minimum contacts in a case where general (as opposed to specific) personal jurisdiction is at issue. Because the present dispute does not relate to any alleged contacts that Southern has with Illinois, only general personal jurisdiction is at issue. *See RAR*, 107 F.3d at 1277 (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8, 416 (1984)).

supplemental response brief citing three additional facts that they believe indicate that Southern maintains continuous and systematic contacts with Illinois: (1) Southern purchases significant amounts of coal from Illinois mines, (2) Southern serves as a guarantor on various transactions by Mirant, and (3) Southern owned and operated two synthetic fuel plants in Illinois.[4]

During 2001 and 2002, Southern was involved in at least eight contracts to purchase unspecified amounts of coal from mines in Illinois. (Supplemental Resp. Opp'n Mot. Dismiss Cross-cl. Ex. D at 5-10.) At least two of these agreements were in effect in February 2002 when this suit was filed. (*Id.* at 5-7) (one contract in effect from January 1, 2000 through December 31, 2002; another contract in effect from July 1, 1994 through December 31, 2007). However, although the purchased coal came from Illinois mines, the purchase agreements were negotiated with non-Illinois companies. (*Id.* at 5-10) (companies providing the coal were the American Coal Sales Company in Lexington, Kentucky; the Peabody COALSALES Company in St. Louis, Missouri; Emerald International Corporation in Florence, Kentucky; Peabody COALTRADE, Inc. in St. Louis, Missouri; and Consolidated Coal Company in Atlanta, Georgia). Regardless,

---

[4] In determining whether personal jurisdiction exists while deciding a motion to dismiss, I am not limited to consideration of the pleadings, but may examine discovery materials. See 4 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1067.6 (3d ed. 2002); *Jobe v. ATR Mktg., Inc.*, 87 F.3d 751, 753 (5th Cir. 1999).

even if Southern regularly purchased coal directly from Illinois companies, such purchases do not satisfy the minimum contacts requirement for the assertion of general personal jurisdiction. *Helicopteros*, 466 U.S. at 418 ("[M]ere purchases, even if occurring at regular intervals, are not enough to warrant ... assertion of [personal] jurisdiction over a nonresident corporation in a cause of action not related to those purchase transactions.").[5]

Insurers' evidence with respect to Southern's guarantee of certain Mirant transactions is likewise insufficient to establish continuous and systematic contacts of Southern with Illinois. The only connection between Southern's acting as guarantor on Mirant transactions and Illinois is that one of the underlying contracts involved an Illinois entity. (Supplemental Resp. Opp'n Mot. Dismiss Cross-cl. Ex. C.) This hardly constitutes continuous and systematic contacts with Illinois. Insurers' claim that Southern owned and operated two synthetic fuel plants in Illinois also fails to establish that Southern had minimum contacts with Illinois sufficient to establish general personal jurisdiction. Far from showing that Southern owned and operated synthetic fuel plants in Illinois, the evidence submitted by Insurers shows only that two

---

[5] In *Helicopteros*, the defendant, a Colombian corporation providing helicopter transportation services in South America had, over an eight-year period, purchased approximately 80% of its fleet (as well as spare parts and accessories) from a company in Texas. The Court held that these purchases were insufficient contacts to warrant the exercise of general personal jurisdiction over the defendant in Texas.

subsidiaries of Southern owned a 24.975% interest in a limited partnership, which in turn operated two synthetic fuel plants in Illinois for eight months in 2001. (Supplemental Resp. Opp'n Mot. Dismiss Cross-cl. Ex. A at 5.) Ownership by subsidiaries of a minority interest in a partnership operating in Illinois for eight months (an operation that ceased prior to this lawsuit) does not constitute continuous and systematic contact by Southern with Illinois.

Finally, Insurers also point out that Southern entered into a number of insurance contracts with Continental Casualty Company and Columbia Casualty Company (who were, recall, the original plaintiffs in this litigation), and that those insurers are both Illinois corporations. An out-of-state party's contract with an in-state party, however, does not alone establish minimum contacts. *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 716 (7th Cir. 2002) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985)). Contract terms and the parties' course of dealing need to be considered when determining whether the out-of-state party purposefully availed itself of the privilege of conducting activities in the forum such that personal jurisdiction may be exercised over it. *Id.* Insurers point to no such additional evidence, and the fact that Southern entered into contracts with Illinois corporations, which are not at issue here, does not establish sufficient minimum contacts by Southern with Illinois.

Even when considered together, the contacts pointed to by Insurers--the former ownership of Mirant, the purchases of Illinois coal, the guarantee of Mirant transactions, the minority interest in an operator of synthetic fuel plants, and the contracts with Illinois corporations--do not constitute continuous and systematic contacts with Illinois by Southern. The Supreme Court's decision in *Helicopteros* "suggests very strongly that the threshold contacts required for a constitutional assertion of general jurisdiction over a nonresident defendant are very substantial, indeed." 4 Wright & Miller, § 1067.5. *See also Wilson v. Humphreys (Cayman), Ltd.*, 916 F.2d 1239, 1245 (7th Cir. 1990) (noting that *Helicopteros* established "a fairly high standard in practice"). Southern's contacts with Illinois fail to meet this high threshold.

### III. Conclusion

While this case was properly removed, crossclaimants fail to establish that crossclaim defendant has sufficient minimum contacts with Illinois such that I may exercise personal jurisdiction over it. Crossclaim defendant's motion to dismiss is therefore GRANTED.

ENTER ORDER:

*Elaine L Bucklo*

**Elaine E. Bucklo**
United States District Judge

Dated: September 25, 2003